# United States Tax Court

T.C. Memo. 2022-42

TRACY RENEE VALENTINE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 6724-19.                              Filed April 28, 2022.

————

In 2016 P worked as a sales associate for a multi-level marketing company and received commissions on her sales. P also received disability payments from the Department of Veterans Affairs ("VA") and retirement distributions from the Department of Defense.

P filed late her income tax return for the year 2016. On that return P claimed significant business expense deductions on Schedule C, "Profit or Loss From Business", for travel and miscellaneous expenses. P excluded a large portion of her retirement distributions from gross income on the premise that a disability determination from the VA entitled her to exclude both her disability payments and a portion of her retirement distributions.

By a statutory notice of deficiency issued in 2019, R determined that P improperly excluded the retirement distributions from gross income and that her claimed business expense deductions should be disallowed. R also determined that P is liable, pursuant to I.R.C. § 6651(a)(1) and (a)(2), for additions to tax for failure to file a return and failure to pay tax shown on a return.

*Held*: P's retirement distributions do not qualify for exclusion under I.R.C. § 104(a)(4) and therefore are properly includible in gross income under I.R.C. § 61(a).

**Served 04/28/22**

[*2]         *Held, further*, with few exceptions, P failed to substantiate her entitlement to her claimed deductions for business expenses.

         *Held, further*, P is liable for additions to tax under I.R.C. § 6651(a)(1) and (a)(2).

————————

Tracy Renee Valentine, pro se.

*Bartholomew Cirenza* and *Stephen C. Welker*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:   The Internal Revenue Service ("IRS") issued to petitioner, Tracy Renee Valentine, a statutory notice of deficiency ("SNOD") pursuant to section 6212[1] on February 19, 2019, determining for the year 2016 a deficiency in her federal income tax in the amount of $11,034 (and additions to tax).

Ms. Valentine filed with this Court a timely petition under section 6213(a) for redetermination of the deficiency and additions to tax. We must decide the following issues: (1) whether Ms. Valentine may exclude a portion of her retirement distributions in the year 2016 from gross income; (2) whether she is entitled to certain business expense deductions she claimed for the year 2016; (3) and whether she is liable for the section 6651(a)(1) and (a)(2) additions to tax determined by the IRS. We will uphold the IRS's determinations in large part, and we will uphold the additions to tax under section 6651(a)(1) and (a)(2).

On the evidence before us, and employing the burden-of-proof principles set out below, we find the following facts.

—————————————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code ("the Code", Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the Code of Federal Regulations ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded.

[*3]                               FINDINGS OF FACT

At the time she filed her petition, Ms. Valentine resided in the State of Maryland.

*Disability payments*

For 22 years Ms. Valentine served her country in the U.S. Army. She was honorably discharged in 2002, and thereafter she received monthly disability payments from the Veterans' Administration (since 1989 the Department of Veterans Affairs, with both entities referred to as the "VA"), for "service-connected disabilities". The amount of each monthly disability payment correlated with a service-connected disability determination (stated as a percentage of total disability) issued by the VA to Ms. Valentine. In 2014 her combined "service-connected" disability rating was 60%; and in 2016 she received, pursuant to the VA's determination, payments of approximately $1,100 per month in January, February, March, and April. Effective May 1, 2016 (and reported to her by letter of May 27, 2016), the VA increased her combined "service-connected" disability rating to 90%, and thereafter she received payments of approximately $1,700 per month for the remainder of 2016, for a total of $18,000 for the year.

The parties agree that these disability payments are not taxable. The VA's determinations made no reference to Ms. Valentine's disability being "combat-related".

*Retirement distributions*

In addition to her disability payments, Ms. Valentine received retirement distributions from her Army-based retirement plan in 2016 totaling $23,801. (It is unclear whether her retirement distributions were calculated on the basis of years of service or otherwise.) She received from the U.S. Department of Defense Accounting and Finance Services ("DOD") a Form 1099–R, "Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.", reporting the entire amount of the retirement distributions as "taxable".

The taxability of these retirement distributions is in dispute.

**[*4]** *Air Force employment in 2016*

In 2016 Ms. Valentine worked as a civilian Equal Opportunity Employment Specialist for the U.S. Air Force. In this capacity she worked primarily at Andrews Air Force Base in Maryland, a short distance from her home. She also traveled to Maxwell Air Force Base in Montgomery, Alabama, for Air Force training. The Air Force paid for Ms. Valentine's travel expenses to Maxwell Air Force Base (including airfare) and provided her a per diem payment for meal and incidental expenses incurred during travel.

*LegalShield self-employment in 2016*

In 2016 Ms. Valentine also worked (as she had since 2000) as an independent sales associate for Pre-Paid Legal Services, Inc., d.b.a. LegalShield. LegalShield is a multi-level marketing corporation that sells legal insurance. Ms. Valentine marketed its products to small-business owners and similar target markets. She received approximately $2,500 in commissions in 2016, which was consistent with the amount of commissions she had received from LegalShield in prior years. LegalShield reported Ms. Valentine's commissions to the IRS on Form 1099–MISC, "Miscellaneous Income".

Ms. Valentine attended multiple in-state and out-of-state events hosted by LegalShield in 2016. She attended "Sensational Sunday" meetings and "Business Opportunity Meetings" (collectively, "BOMs") in Maryland and Delaware. These BOMs typically consisted of business networking, sales associate recognition and training, and presentations by LegalShield guest presenters. Ms. Valentine invited potential clients to attend BOMs to expose them to LegalShield's products and membership opportunities. She also attended out-of-state leadership summit conferences hosted by LegalShield in San Jose, California, and New Orleans, Louisiana. As to another LegalShield destination— Montgomery, Alabama—she also had business related to her employment with the Air Force (i.e., the training mentioned above), and in at least one instance the Air Force reimbursed her expenses.

Under the burden of proof and substantiation principles discussed below in part I.A, we find that Ms. Valentine paid business expenses related to LegalShield in amounts (set out below in part II.B.7) that total $1,812.

**[\*5]** *Examination and SNOD*

Ms. Valentine did not file a federal income tax return for 2016 by the extended October 2017 due date. Neither did she pay any income tax for 2016 beyond the amounts that had been withheld from her wages and retirement distributions by payors, as reported on Form W–2, "Wage and Tax Statement" (i.e., $4,730 from her Air Force wages), and Form 1099–R (i.e., $1,553 from her retirement distributions).

The IRS prepared for Ms. Valentine a substitute for return ("SFR") pursuant to section 6020(b). The SFR was subscribed by an officer of the IRS, contained Ms. Valentine's contact and identification information and a computation of her tax liability for 2016, and purported to be a valid return. Using information provided by third parties, the IRS included on that SFR the $23,801 of retirement distributions reported by the DOD and $2,458 reported by LegalShield. (The SFR did not reflect the $18,000 of disability payments not in dispute.) On February 19, 2019, the IRS issued to Ms. Valentine an SNOD determining a tax deficiency of $11,034 for 2016, as well as additions to tax pursuant to section 6651(a)(1) and (a)(2).

*Petitioner's late 2016 federal income tax return*

After she received the SNOD and before she filed her Tax Court petition, Ms. Valentine hired an accountant to prepare her 2016 return on Form 1040, "U.S. Individual Income Tax Return". Her accountant calculated the expense deductions and the taxable portion of her retirement distributions that were reported on the return. Ms. Valentine provided the disability letters from the VA to her accountant, but the evidence does not show what information Ms. Valentine provided to the accountant regarding her business expense deductions or the per diem reimbursements she received from the Air Force.

The return as prepared by Ms. Valentine's accountant reported as follows:

Ms. Valentine's return reported as gross income only $3,158 of her retirement distributions, and she excluded the remaining $20,643 of the $23,801 she had received. The return did not include any explanation for her exclusion of most of the retirement distributions, but Ms. Valentine did attach the Form 1099-R she had received from the DOD. She excluded (i.e., she did not report on her return) the entire

[*6] $18,000 of her disability payments, and the Commissioner does not dispute this treatment.

On her return Ms. Valentine reported as gross income on Schedule C, "Profit or Loss From Business", her LegalShield commissions of $2,458; and on that Schedule C she deducted business expenses of $11,713 yielding a claimed business loss of $9,255, offsetting that portion of gross income otherwise appearing on the return.

Ms. Valentine's claimed business expense deductions consisted of expenses for advertising, car and truck expenses (mileage), commissions and fees, legal and professional services, office expenses, travel and meals (including airfare for her out-of-state travel), and other miscellaneous expenses (including website fees, postage, telephone charges, convention fees, tolls, "Info tracks", and incidentals). A small portion of her reported travel and meal expenses correlate to her travel to in-state and out-of-state LegalShield events. She claimed deductions for travel and meal expenses (which the Air Force had reimbursed) for her trip to Montgomery, Alabama, for Air Force training. She also claimed business travel expense deductions for travel to locations in which she had friends and family members, including Chesapeake, Virginia, the State of Connecticut, New York City, New York, and Greenville, South Carolina.

On March 25, 2019 (i.e., before she filed her Tax Court petition), Ms. Valentine filed with the IRS her Form 1040 for 2016. She did not submit a payment with the return, since it claimed a refund of $2,626.

On April 25, 2019, Ms. Valentine filed a timely petition in this Court for redetermination of the deficiencies and additions to tax. Her petition stated: "I filed my 2016 tax March 15, 2019 [later stipulated to be March 25, 2019] and I am due a refund in the amount of $2,626.00."

OPINION

I. *Applicable legal principles*

A. *Burden of proof as to the deficiency*

The IRS's determination of a deficiency in the SNOD that it issued to Ms. Valentine, which arises from the disallowance of deductions that she claimed, is presumed correct; and Ms. Valentine has the burden to prove that the adjustments are incorrect. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Taxpayers must satisfy

[*7] the specific requirements for any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

The IRS may rely on information returns (such as Forms 1099) from third-party payors when determining a taxpayer's taxable income. *See, e.g.*, *Cabirac v. Commissioner*, 120 T.C. 163, 165–67 (2003), *aff'd per curiam without published opinion*, 95 A.F.T.R.2d (RIA) 2004-5490 (3d Cir. 2004).

Ms. Valentine does not contend that the burden of proof should shift to the Commissioner pursuant to section 7491(a), and there is no support in the record for such a contention. It follows that in this case Ms. Valentine has the burden to prove that the Commissioner's determination of a deficiency for 2016 is incorrect.

B.     *Exclusions of military retirement pay from gross income*

Section 61(a) provides that gross income means "all income from whatever source derived". Pensions and retirement allowances constitute gross income unless otherwise excluded by law. § 61(a)(11); Treas. Reg. § 1.61-11(a). Military retirement pay is pension income within the meaning of section 61(a)(11). *Wheeler v. Commissioner*, 127 T.C. 200, 205 n.11 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

It is well established that statutory exclusions from income are narrowly construed. *Commissioner v. Schleier*, 515 U.S. 323, 328 (1995). Taxpayers seeking an exclusion from income must demonstrate that they are eligible for the exclusion and "bring themselves within the clear scope of the exclusion." *Dobra v. Commissioner*, 111 T.C. 339, 349 n.16 (1998).

Section 104(a)(4) provides the general rule that amounts received as a pension, annuity, or similar allowance are not included in gross income when they arise from personal injuries or sickness resulting from active service in the armed forces of any country. As the Commissioner concedes, this is the provision that, in conjunction with section 104(b)(2)(D), entitles Ms. Valentine to exclude from gross income her disability payments from the VA. She attempts to extend this exclusion to her retirement distributions from the DOD, but section 104(b) limits the exclusion prescribed in subsection (a)(4), as relevant here, to an individual who either "receives [a pension, annuity, or similar

[*8] allowance] by reason of *combat*-related injury",[2] § 104(b)(2)(C) (emphasis added), or "on application therefor . . . *would be entitled to receive* [not "is receiving"] disability compensation from the Veterans' Administration," § 104(b)(2)(D) (emphasis added).[3] In the latter case, the amount excludable from gross income is "not . . . less than the maximum amount which such individual, on application therefor, *would be* entitled to receive as disability compensation from the Veterans' Administration."[4] § 104(b)(4) (emphasis added).

The restrictions imposed in section 104(b) are discussed in the legislative history underlying the Tax Reform Act of 1976, Pub. L. No. 94-455, § 505(b), 90 Stat. 1520, 1567, in which Congress explained the restrictions as follows:

> At all times, Veterans' Administration disability payments will continue to be excluded from gross income. In addition, even if a future serviceman who retires *does*

---

[2] Section 104(b)(3) defines the term "combat-related injury" as an injury incurred "(i) as a direct result of armed conflict, (ii) while engaged in extrahazardous service, or (iii) under conditions simulating war; or (B) which is caused by an instrumentality of war."

[3] In 2018—i.e., after the year at issue—section 104(b)(2)(D) (but not section 104(b)(4)) was amended to reflect the change in name of the Veterans' Administration (to the Department of Veterans Affairs), but the amendment has no effect on the outcome of this case.

[4] Ms. Valentine cites IRS Publication 525, "Taxable and Nontaxable Income" (2016), to support her position regarding the nontaxable nature of her retirement distributions. Administrative guidance contained in IRS publications is not binding on the IRS, nor can it change the plain meaning of tax statutes. *Miller v. Commissioner*, 114 T.C. 184, 195 (2000). Even so, Ms. Valentine misconstrues IRS Publication 525 to support her contention that a portion of her retirement distributions is nontaxable. IRS Publication 525 provides an example of the disability payment exclusion under section 104(a)(4) and corresponding limitation under section 104(b)(2)(D) and (b)(4). The paragraph entitled "Retroactive VA determination[s]" states that

> [i]f [a taxpayer] retire[s] from the armed services based on years of service and [is] later given a retroactive service-connected disability rating by the VA, [the taxpayer's] retirement pay for the retroactive period is excluded from income up to the amount of VA disability benefits [the taxpayer] *would have been entitled to receive*.

IRS Publication 525, at 18 (emphasis added). That circumstance can be contrasted with that of a retiree who timely received a prospective disability rating and who in the first instance received from the VA the disability payments appropriate for that rating, and who was not granted any retroactive correction of that disability rating and was therefore not entitled to any retroactive disability payments.

**[\*9]** *not receive his disability benefits from the Veterans' Administration*, he will still be allowed to exclude from his gross income an amount equal to the benefits he could receive from the Veterans' Administration. Otherwise, future members of the armed forces will be allowed to exclude military disability retirement payments from their gross income only if the payments are directly related to "combat injuries."

S. Rep. No. 94-938, at 139 (1976), 1976-3 C.B. (Vol. 3) 49, 176–77 (emphasis added); *see also Reimels v. Commissioner*, 123 T.C. 245, 257 (2004), *aff'd*, 436 F.3d 344 (2d Cir. 2006); *Kiourtsis v. Commissioner*, T.C. Memo. 1996-534. (Ms. Valentine was, by way of contrast, a retiree who *did* "receive [her] disability benefits from the Veterans' Administration".)

A retired service member may receive both a disability pension from the VA (which is excludable from income) and retirement distributions (such as a service pension) from her respective branch of the armed forces; but payments under retirement plans should generally be included in income regardless of the existence of a VA disability determination, except where certain exceptions may apply. *See Lambert v. Commissioner*, 49 T.C. 57 (1967); *Sidoran v. Commissioner*, T.C. Memo. 1979-56, *aff'd*, 640 F.2d 231 (9th Cir. 1981). We have held that where a petitioner already receives an excludable disability benefit from the VA, "a VA disability determination does not prove that a portion of [additional retirement distributions are] received for injuries sustained during active service" for the purpose of section 104(a)(4).[5] *Holt v. Commissioner*, T.C. Memo. 1999-348, 78 T.C.M. (CCH) 625, 627 (noting that a percentage of disability determination had already resulted in a disability benefit which was excluded from the taxpayers' income).

A retired service member who did not receive a disability determination from the VA and who is not currently receiving disability benefits may exclude from gross income a portion of her retirement benefits under section 104 if she can prove that she would qualify for a disability determination from the VA. *See* S. Rep. No. 94-938, at 139,

---

[5] The "part of the retired pay of a member of an armed force, computed . . . on the basis of years of service, which exceeds the retired pay that he would receive if it were computed on the basis of percentage of disability is not considered . . . [an excludable] pension, annuity, or similar allowance for personal injury or sickness . . . ." Treas. Reg. § 1.104-1(e)(1).

[*10] 1976-3 C.B. (Vol. 3) at 176–77.  Similarly, a service member who receives a retroactive disability determination by the VA may exclude from gross income a portion of the retirement benefits she received during the retroactive period equal to the percentage of her disability determination (if she did not already exclude them prior to the determination).  *See, e.g.*, *Strickland v. Commissioner*, 540 F.2d 1196 (4th Cir. 1976), *rev'g* T.C. Memo. 1974-188; *see also* Rev. Rul. 78-161, 1978-1 C.B. 31.

C.    *Schedule C expenses*

Pursuant to section 162(a), a taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  In contrast, except where specifically enumerated in the Code, no deductions are allowed for personal, living, or family expenses.  § 262(a).

When deductions are in dispute, the taxpayer must satisfy the specific requirements for any deduction claimed.  *See INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84.  Furthermore, taxpayers are required to maintain records sufficient to substantiate items underlying their claimed deductions.  *See* § 6001; Treas. Reg. § 1.6001-1(a); *see also* Treas. Reg. § 1.6001-1(e) ("The books or records . . . shall be retained so long as the contents thereof may become material in the administration of any internal revenue law").  The failure to keep and present accurate records counts heavily against a taxpayer's attempted proof.  *Rogers v. Commissioner*, T.C. Memo. 2014-141, at *17.

Section 274(d) establishes higher substantiation requirements for expenses related to travel, meals, and lodging while away from home, entertainment, gifts, and "listed property", defined in section 280F(d)(4) to include passenger automobiles.  For expenses associated with "listed property", taxpayers must prove: (1) the amount of each separate expenditure with respect to such property; (2) the amount of each business use (such as mileage for automobiles); (3) the date of the expenditure or use with respect to listed property; and (4) the business purpose for an expenditure or use with respect to such property.  Temp. Treas. Reg. § 1.274-5T(b)(6).  Section 274(d) provides that no deduction under section 162 shall be allowed for these expenses "unless the taxpayer substantiates [the expenses] by adequate records or by sufficient evidence corroborating the taxpayer's own statement".  An "adequate record[]" is an "account book, diary, log, statement of expense, trip sheet[], or similar record" that is "made at or near the time of the

**[\*11]** expenditure or use" and must be supported by documentary evidence (such as receipts or paid bills), except where duplicative of the underlying record. Temp. Treas. Reg. § 1.274-5T(c)(1) and (2). An adequate record generally must contain a written statement of business purpose. *Id.* subpara. (2)(ii)(B). However, the required degree of substantiation "will vary depending upon the facts and circumstances" surrounding the expense, and a written explanation of business purpose is not required where business purpose "is evident from the surrounding facts and circumstances". *Id.*[6]

For travel expenses, taxpayers must substantiate (1) the "[a]mount of each separate [travel] expenditure"; (2) the time and place of the travel; and (3) the "[b]usiness reason for travel or nature of the business benefit derived . . . as a result of travel." *Id.* para. (b)(2). If a taxpayer's trip is primarily personal, her traveling expenses are not deductible, even if the taxpayer engages in business activities at her destination. § 262(a); Treas. Reg. § 1.162-2(b)(1).[7] However, expenses paid or incurred at the destination that are properly allocable to the taxpayer's trade or business are deductible even if the traveling expenses to and from the destination are not deductible. Treas. Reg. § 1.162-2(b)(1). Whether travel is primarily related to the taxpayer's trade or business or is primarily personal is a question of fact. *Id.* subpara. (2); *see also Holswade v. Commissioner*, 82 T.C. 686, 701 (1984). The taxpayer must prove that the trip was primarily related to her trade or business. *See* Rule 142(a).

The substantiation requirements imposed by section 274(d) preclude the use of the "*Cohan* rule" to estimate the amounts of deductions subject to that section. *Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969). Section 274(n) further limits deductions for most meal and entertainment expenses to "50 percent of the amount of such expense or item which would . . . be allowable as a deduction." As authorized by Treasury Regulation § 1.274-5A(h), the IRS has established a method by which taxpayers may elect to use a specific dollar amount for meals while traveling, in lieu of substantiating the actual cost of those meals.

---

[6] For example, a written explanation of the business purpose of travel is not required "in the case of a salesman calling on customers on an established sales route". Temp. Treas. Reg. § 1.274-5T(c)(2)(ii)(B).

[7] The Code generally disallows deductions for travel expenses (including transportation, meals, and lodging) except where they are otherwise specifically allowed. Treas. Reg. § 1.262-1(b)(5).

**[\*12]** The IRS has adopted the "per diem" rates published by the General Services Administration ("GSA") for substantiating the cost of meals, incidental expenses, and lodging for a given period and locality. Rev. Proc. 2011-47, 2011-42 I.R.B. 520.

D. *Additions to tax under section 6651(a)(1) and (2)*

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return (unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect). *See also United States v. Boyle*, 469 U.S. 241, 245 (1985). The addition consists of 5% per month (up to a maximum of 25%) of "the amount required to be shown as tax on such return". § 6651(a)(1).

Section 6651(a)(2) provides for an addition to tax for failure to timely pay "the amount shown as tax on any return specified in paragraph (1)" unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect. The addition consists of 0.5% per month (up to a maximum of 25%) of "the amount shown as tax on such return". § 6651(a)(2). The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply. *See* § 6651(c)(1).

The Commissioner bears the burden of production with respect to additions to tax under section 6651(a)(1) and (2).[8] *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). To meet this burden, he must produce sufficient evidence that it is appropriate to impose the addition to tax. Once the Commissioner has met his burden of production, the taxpayer then bears the burden of proof as to reasonable cause or other mitigating factors. *See Higbee*, 116 T.C. at 447. When a taxpayer has not filed a return, the section 6651(a)(2) addition to tax may not be imposed unless the Secretary has prepared an SFR that meets the requirements of section 6020(b). *Wheeler*, 127 T.C. at 208–09.

Pursuant to section 6651(g)(2), an SFR prepared by the Commissioner under section 6020(b) is treated as a taxpayer return for purposes of determining the addition to tax under section 6651(a)(2). To constitute a valid SFR under section 6020(b), "the return must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any

---

[8] Additions to tax under section 6651 are specifically excepted from the section 6751(b)(1) "immediate supervisor" penalty approval requirement. § 6751(b)(2).

[*13] attachments must purport to be a 'return'". *Rader v. Commissioner*, 143 T.C. 376, 382 (2014) (quoting *Spurlock v. Commissioner*, T.C. Memo. 2003-124, 85 T.C.M. (CCH) 1236, 1244), *aff'd in part*, *appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015).

II.  *Analysis*

A.  *Retirement distributions*

Ms. Valentine argues that the disability determination she received from the VA entitles her to exclude from gross income not only her disability payments (which the Commissioner concedes, pursuant to section 104(a)(4) and (b)(2)(D)) but also a portion of her retirement distributions.[9] Ms. Valentine does not cite a specific subparagraph of section 104(b) that would preserve the exclusion of section 104(a)(4). *See Reimels*, 123 T.C. at 255–56 ("Section 104(b)(2) provides no independent basis for exclusion. Instead, consistent with express legislative intent, it limits the classes of persons who otherwise might be eligible for the section 104(a)(4) exclusion"). As we observed in part I.B above, the two available contentions appear to be that the amounts were received by reason of a combat-related injury, § 104(b)(2)(C), (b)(3), or that the amounts are those that the service member "would be entitled to receive as disability compensation", § 104(b)(2)(D), (b)(4). We consider each of these two issues separately.

1.  *"[C]ombat-related injury"*

Under section 104(b)(2)(C) and (b)(3), Ms. Valentine may exclude a portion of her retirement distributions only if the distributions qualify as "amount[s] . . . [received] by reason of a combat-related injury". § 104(b)(2)(C). Before trial, she made a single reference to "combat":

> [I]n 2015 or '14, I was made aware that my retirement income from the Army [is excluded from gross income], if I'm a disabled vet, *combat-service related*—and there's other stipulations, but that's the one I fall under. [Emphasis added.]

---

[9] Ms. Valentine reported $3,158 of gross income from pensions and annuities but could not explain how her accountant calculated this number (or why it was identical to the $3,158 that appeared in the "State distribution" section (box 14) of the Form 1099–R she received from the DOD).

**[\*14]** Her phrase "combat-service related", given in a pretrial statement,[10] conflates two concepts in the exclusion provided in section 104—payments on account of injury "resulting from active *service* in the armed forces", § 104(a)(4) (emphasis added), and payments "by reason of a *combat*-related injury", § 104(b)(2)(C), (b)(3) (emphasis added). If her blending of these terms was accidental, then we believe our discussion below in part II.A.2 addresses her contention. But if she did intend the additional or alternative contention that her Army retirement payments were "by reason of a *combat*-related injury", then this contention fails for lack of evidence.

Ms. Valentine made no showing that the Army or the VA ever determined that she had a "combat-related injury". Rather, the letters Ms. Valentine received from the VA detail her "*service*-connected disability compensation" (emphasis added), without reference to "combat". Assuming that the Tax Court could make a "combat-related" finding in the absence of such a ruling by the military, Ms. Valentine did not provide evidence to support such a finding. She did not allege (or provide evidence to support a contention) that her injuries were "*combat*-related" as required by section 104(b)(2)(C) and (b)(3) (emphasis added). In her sworn trial testimony, Ms. Valentine made no reference to combat. She offered no documentary evidence that refers to combat. As to the disability that she suffers, she made no explanation of it that would enable us to infer what caused it.

### 2. *"[E]ntitled to receive as disability compensation"*

Ms. Valentine contends that, on account of her 60% and 90% VA disability determinations, she is entitled to exclude from gross income 60% of her Army retirement distributions for each of the first four months of 2016 and 90% of her Army retirement distributions for the last eight months of 2016. In so arguing, Ms. Valentine multiplies her retirement distributions by her 60% and 90% disability ratings and

---

[10] After Ms. Valentine's pretrial statement that used the word "combat", the Court explained her need to give, as sworn testimony, all the information on which her case depended: "You may feel like a few moments ago you already explained your retirement disability situation, and you may feel like you're done, but I'm sad to inform you you're not. Sitting there at that table [representing herself pro se], you are your lawyer. You're not giving testimony when you're there. You're explaining your position. And in a moment, we're going to have you come up and take the oath, and then give testimony that's sworn testimony and that can be relied on as evidence. And so make sure that when you're giving your testimony, you go ahead and tell the whole story. Don't suppose that what you said a moment ago will substitute for that." Her testimony thereafter did not mention "combat".

[*15] thereby radically misconstrues the text and meaning of section 104(a)(4) and (b)(2)(D). A retired service member may exclude a portion of her retirement distributions in an amount equal to the benefit that she "*would be entitled to receive* as disability compensation from" the VA, § 104(b)(4) (emphasis added), but only if she is not currently receiving excludable disability benefits from the VA, as Ms. Valentine was receiving. The legislative history supports this interpretation of section 104(b)(4). *See* S. Rep. No. 94-938, at 138–39, 1976-3 C.B. (Vol. 3) at 176–77.

The evidence shows that Ms. Valentine was already receiving— as disability payments from the VA—the entire amount that she was entitled to receive from the VA. A 60% disability determination (made in 2014) was applied to the first four months of 2016; and a 90% disability determination (made in May 2016) was applied to the remaining eight months of 2016. These facts indicate that in 2016 Ms. Valentine received from the VA the entire amount that she was "entitled to receive as disability compensation from the Veterans' Administration", for purposes of section 104(b)(4). She suggests no basis for concluding otherwise.

At trial Ms. Valentine seemed to complicate the question by characterizing as "retroactive" the VA's determination of her disability. A retroactive disability determination reflects the VA's decision that a prior disability determination had been incorrect and should be corrected with retroactive effect; and it may indicate that previous payments that were deemed not allocable to a disability when paid should have been so allocated. Therefore, upon receipt of an actually retroactive disability determination from the VA, a service member may be entitled to exclude a portion of the retirement benefits that she received during the retroactive period and that (in hindsight) were mischaracterized as taxable. *See* Rev. Rul. 78-161. Ms. Valentine's "retroactive" contention might be: that after she had received her 60% and 90% disability payments, she received a retroactive determination that her disability was greater; that she was therefore entitled to disability payments greater than the VA had actually paid her in 2016; and that therefore a portion of her Army retirement paid should be excluded from gross income pursuant to section 104(b)(4). If this is her contention, it fails on the facts of this case.

The VA made no "retroactive" disability determination for Ms. Valentine after 2016 that was "retroactive" to 2016. What Ms. Valentine's evidence shows is only that a determination of 60%

**[\*16]** made in 2014 was applied prospectively to the first four months of 2016, and that an increased 90% determination made in May 2016 was applied contemporaneously to that month and the remaining months of 2016.

Ms. Valentine did not offer evidence to show—nor did she even allege—that the VA made any post-2016 determination of her disability, nor does she argue that any such post-2016 disability determination should be retroactively applied to 2016. Rather, the letters from the VA that she offered as evidence outline only the "current" disability benefits paid to her as of their dates of April 15 and May 27, 2016. The effective dates of her then-current disability ratings were December 1, 2014 (effective for the first four months of 2016), and May 1, 2016 (effective for the last eight months of 2016); and there is no evidence to support a contention that either of these determinations or any other was retroactive. Section 104(b)(2)(D) and (b)(4) therefore provides no basis for the exclusion she claims; and we hold that the retirement distributions Ms. Valentine received of $23,801 are properly includible in her gross income pursuant to section 61(a)(11).

B.     *Business expense deductions on Schedule C*

Under the provisions of section 274, any deduction claimed with respect to an expense paid or incurred for business travel (e.g., airfare, lodging, meal, and incidentals) and the use of a passenger automobile will be disallowed unless the taxpayer substantiates specific elements of the expense and use by adequate records or by sufficient evidence corroborating the taxpayer's own statement. § 274(d); Temp. Treas. Reg. § 1.274-5T(c)(1). As we discuss below, Ms. Valentine fails to substantiate most of the expenses for which she claimed deductions on Schedule C, and we must deny deductions for the unsubstantiated expenses.

To substantiate her claimed deductions, Ms. Valentine offered her personal calendar, "screen shot" captures of her online bank accounts depicting various debit and credit transactions, and ticket stubs to certain LegalShield events. To support her testimony regarding her deductions, she also offered summaries of the foregoing information (specifically, a monthly summary, which lists total mileage and meal allowance deductions by month, a daily summary, which lists mileage and meal deductions claimed for each instance of travel, a summary of airfare and public transportation expenses, and a summary of fees paid for LegalShield conferences) which she had prepared in anticipation of

**[\*17]** trial with the help of an attorney. We analyze the evidence for its probative value and summarize at the end of this section the claimed deductions for which Ms. Valentine has provided sufficient substantiation.

1.  *Testimony*

We found Ms. Valentine, as a witness, to be subjectively sincere. However, she failed to keep detailed logs and records of her business travel and expenses as required by the Code and the regulations. Her memory, three years after the end of the year at issue, was likely imprecise and unduly selective, to her own benefit.

Other factors also undermine Ms. Valentine's testimony. At trial, she was generally unfamiliar with certain calculations her accountant used to complete the Schedule C[11] and was thus unable to offer clear testimony to support substantiation of those expenses. She also testified that the amounts in her documentary evidence would match the amounts reported on her return, but that statement was largely untrue.[12]

Consequently, Ms. Valentine's uncorroborated testimony was not completely convincing.

2.  *Calendar*

Throughout 2016 Ms. Valentine kept a calendar on which she listed personal and business travel. For each instance of travel, she made an entry giving the intended destination and the automobile mileage she expected to accrue (but excluded specific information regarding air travel and lodging, such as flight numbers or the names of

---

[11] Ms. Valentine did not calculate the meal deductions she reported on her return, and instead she relied on her accountant's calculations. She was uncertain of the accuracy of the meal allowance values in the summaries she provided. This is particularly problematic because a taxpayer may deduct only 50% of a meal expense or the per diem allowable amount. § 274(n).

[12] A mileage deduction calculated using the total mileage handwritten on Ms. Valentine's calendar does not match either her monthly summary or the Schedule C filed with her Form 1040. Using the 2016 standard mileage rate of $0.54 per mile under I.R.S. Notice 2016-1, 2016-2 I.R.B. 265, and the mileage listed each month on Ms. Valentine's calendar (totaling 11,467 miles) would yield a total mileage deduction of $6,192; but her monthly summary calculates a total mileage deduction of $6,607 (for 12,235 miles); and her Schedule C reports "car and truck expenses" of $6,181 (with total mileage not specified).

**[\*18]** airlines or hotels). Nevertheless, the calendar is not a comprehensive record of her travel and associated expenses. The calendar's primary flaw lies in its nature: A calendar typically lists future events, which one may or may not ultimately attend, and is not the same as a contemporaneous log of actual activity. The evidence shows that Ms. Valentine used her calendar to list events that she planned to attend. For example, a recurring entry for a BOM in Greenbelt, Maryland, appears on almost every Tuesday of the month for each month between March and December. When questioned about these entries, however, Ms. Valentine testified that "every Tuesday [she] did not attend, but [she] tried to attend." Indeed, an entry for "Greenbelt BOM" appears on September 20 and 27, 2016, but Ms. Valentine does not claim a deduction (mileage or otherwise) for any travel on those days, suggesting that her overall attendance did not correspond to her calendar entries and accordingly diminishing the calendar's reliability for substantiating her business deductions.

Other factors also call into question the calendar's accuracy, consistency, and completeness: (1) the calendar lists frequent weekday events that likely conflicted with Ms. Valentine's full-time job working for the Air Force; (2) mileage values on her calendar conflict with mileage values on her summaries for the same dates of travel (or are missing entirely);[13] (3) events that are distant from each other geographically are listed close in temporal proximity, which makes it unlikely that she in fact attended every listed event;[14] and (4) large portions of the calendar are absent from our record, where it appears

---

[13] For example, Ms. Valentine claims 34 miles on March 16 in her daily summary, but her calendar does not contain a mileage entry for the event titled "Business Luncheon" on the same day. Similar discrepancies exist for the entries on her calendar for May 27 (the daily summary claims 290 miles, but no mileage entry appears on the calendar) and June 29 (the daily summary claims 35 miles for a trip to Bowie, Maryland, but the calendar states she was to be in Connecticut and does not contain a mileage entry).

[14] Ms. Valentine's calendar contains entries for anticipated travel to Connecticut, Maryland, and Massachusetts from September 3 through 6, then to New Orleans from September 9 through 11. It also contains entries for anticipated travel to Rockville, Maryland, on October 8 (Saturday), then to New Jersey on October 9 (Sunday) (a distance of approximately 181 miles). Presumably, she had to travel back to Maryland for work at her full-time job on October 11 (the day after Columbus Day).

**[\*19]** that Ms. Valentine tried to scan the calendar into electronic form but missed the tops and bottoms of certain pages.[15]

Especially in view of the heightened standard of proof under section 274, the calendar does not satisfy the "adequate records" requirement. Only where Ms. Valentine is able to corroborate the information on her calendar with additional evidence can we determine that she actually traveled to the reported destinations and paid the reported expenses. As we discuss below, Ms. Valentine provides corroborating evidence for only a few of her reported expenses.

### 3. *Demonstrative exhibits*

Ms. Valentine offered into evidence various typewritten "Summar[ies]", prepared by her attorney after the fact in anticipation of trial, that tally the deductions she claimed. Since these were not contemporaneous records, we did not admit them as substantive evidence but only as demonstrative exhibits showing her contentions. Like her calendar, the summaries suffer from many flaws:

First, the header "2016 Bus Miles" appears above the mileage totals on her monthly summary. In this context we might assume that the word "Bus" is simply an abbreviation for "Business", but Ms. Valentine did apparently include on a separate summary report a separate deduction for a Greyhound bus ticket (for an unlisted date and destination). This reporting casts doubt on whether she actually drove the "Bus Miles" reported or instead purchased a ticket to ride a bus. If these were indeed "Bus Miles" on a Greyhound bus, then she could possibly receive a deduction for the price of her ticket, but not for the bus's mileage.

Second, the total "Std Meal Allowance" amounts on the monthly summary conflict with the "Standard Meal Allowance" amounts on the daily summary: The former claims $136 for meal allowances in the month of June and the latter claims $114 for meal allowances in the same month.[16]

---

[15] For example, the margins cut off calendar information for March 8 through 12, May 10 through 12, June 11 and 18, August 9, and September 4 through 10—all dates for which Ms. Valentine claims travel expense deductions.

[16] The daily summary reports a single meal deduction on June 12 for $114, but it also reports $136 as the total meal deduction claimed for that month. Either the

[*20] Third, the chronological listing of the mileage and meal deductions in the daily summary claims 438 miles (round trip) for a trip from District Heights, Maryland, to Newark, Delaware. The actual distance between those two locations (as to which we take judicial notice, *see* Fed. R. Evid. 201(b)(2), of an online atlas) is only about 200 miles (round trip).

Fourth, the daily summary contains typographical errors that contribute to the summary's overall lack of clarity. For example, an August trip to District Heights, Maryland, has a June 28 return date listed (but appears in the section of the summary dedicated to the month of August). And the summary contains an entry entitled "Return" trip from Dallas, Texas, to District Heights, Maryland, on March 10 that immediately precedes additional travel *to and within* Dallas through March 14.

Fifth, Ms. Valentine did not inform her attorney (who drafted the daily summary) of the per diem payment she received from the Air Force for travel to Maxwell Air Force Base in Montgomery, Alabama. That reimbursement would preclude her claiming a meal allowance deduction for that trip—and yet it appeared on her summary and in the deduction claimed on her return.

We do not expect perfection in business records or in calculations of expenses, but the frequency of these errors undermines the credibility of Ms. Valentine's total claimed mileage and meal allowances.

### 4. *Personal motive for travel to destinations with friends and family*

Ms. Valentine had friends and family residing in several of the locations for which she claimed business travel expense deductions.[17] Although she testified that in each instance her primary purpose was to expose her friends and family members to the LegalShield product line, she offered no additional evidence to distinguish the time spent or

---

individual deduction on June 12 or the total for June is incorrect. Even if the individual deduction in the daily summary is correct, it is inconsistent with Ms. Valentine's monthly summary, which lists a total meal deduction of $136 for the month of June.

[17] These locations include: the State of Connecticut (she claimed deductions for travel to Hartford and Stratford), the State of New York (she claimed deductions for travel to New York City), the city of Greenville, South Carolina, and the city of Chesapeake, Virginia.

**[\*21]** expenses paid for business activities versus personal activities with her friends and family. Her history of making no more than $2,500 per year on LegalShield prompts the question of why someone would be willing to incur substantial travel expense for so little return (indeed, for a loss). As the party bearing the burden of proof, Ms. Valentine was obliged to answer that question and to prove that her purpose for travel to these family-friendly destinations was her LegalShield business. We hold that Ms. Valentine did not sustain that burden for her travel to destinations in which she had friends and family. We conclude that personal considerations justified making these trips without regard to their yielding a business profit. Her claimed deductions for expenses paid for travel to these destinations and within these destinations must be disallowed. In light of this holding, we limit further substantiation analysis to the destinations in which Ms. Valentine did not have resident friends and family.

### 5. *Substantiation as to other destinations*

#### i. *Business purpose*

Ms. Valentine must substantiate the business purpose or "nature of the business benefit derived" for each instance of travel. *See* Temp. Treas. Reg. § 1.274-5T(b)(2)(iv). Generally, a written statement of business purpose is required, except where the business purpose of an expenditure is evident from the surrounding facts and circumstances. *Id.* para. (c)(2)(ii)(B). Ms. Valentine did not provide a written statement regarding the business purpose for any instance of travel. However, she credibly explained at trial the imperative role the BOMs played in business development. Notably, she called on potential clients to solicit their attendance at BOMs, and she attended the meetings with the expectation that she would have the opportunity to sell them LegalShield's products. From these facts and circumstances, we hold that the business purpose of Ms. Valentine's attendance at BOMs was evident so as to meet the exception under Temporary Treasury Regulation § 1.274-5T(c)(2)(ii)(B), and we hold that Ms. Valentine has substantiated the business purpose for her attendance at BOMs for the purposes of section 274. Similarly, each training seminar and leadership summit conference that Ms. Valentine attended was hosted by LegalShield, and for that reason we hold that her attendance at these events (and travel to these events) had an evident business purpose and is substantiated without a written statement.

**[\*22]**                    ii.    *BOMs and training*

Ms. Valentine claims business expense deductions for 83 BOM-related events in 2016: a mix of BOMs, business luncheons, LegalShield question-and-answer sessions, and LegalShield training sessions. Ms. Valentine claims attendance at events in Maryland, Delaware, New Jersey, Alabama, and Virginia. With few exceptions, her calendar contains an entry for each event on the date referenced in her daily summary.

Ms. Valentine does not provide evidence to corroborate most of the entries on her calendar. However, her bank statements show charges paid in Baltimore, Maryland, on December 8 and 15, and in Newark, Delaware, on December 11 that correspond to BOM entries on her calendar.[18] We hold that, in these instances, Ms. Valentine sufficiently substantiated the travel expenses associated with these events and is entitled to deduct mileage and meal allowances. For her trip to Newark, Delaware, we adjust the deductible mileage down to the number of miles that we find to be the accurate round-trip distance (from 438 miles to 200 miles) and the corresponding expense deduction to $108 (at $0.54 per mile consistent with the 2016 standard mileage rates for taxpayers under I.R.S. Notice 2016-1). We also recalculate the meal allowance for the same trip, pursuant to 41 C.F.R. § 301-11.101 and to I.R.S. Revenue Procedure 2011-47, 2011-42 I.R.B. 520, from $57 to $21.[19]

---

[18] Ms. Valentine's bank statements show meal expenses around these dates in Aberdeen, Maryland, which is a short distance from both Baltimore, Maryland, and Newark, Delaware.

Ms. Valentine's bank statements also reflect various expenses for which she does not claim a deduction, such as hotel fees paid in Springfield, Virginia, and meal expenses in Greenbelt, Maryland. We exclude these and other similar expenses from consideration.

[19] We calculated this amount using the Meals & Incidental Expenses (M&IE) Breakdown applicable to the Newark, Delaware, area (Wilmington) for the stated period. *See* FY 2016 Per Diem Rates for Wilmington, Delaware, U.S. Gen. Servs. Admin., https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-results /?action=perdiems_report&fiscal_year=2016&city=Newark&state=DE&zip=      (last visited Apr. 8, 2022). The "First & Last Day of Travel" rate is $40.50 (which we round up to $41). Ms. Valentine reported one day of travel, for which she may claim one half of the allowable meal expense as a deduction. We apply the same analysis for meal allowance calculations discussed hereafter in this opinion (which vary by date and destination).

**[\*23]** Ms. Valentine may deduct $49 of mileage expense (90 miles) for each of her trips to Baltimore, Maryland, on December 8 and 15. We hold that Ms. Valentine did not substantiate expenses for events for which her calendar does not have an entry. She is not entitled to deduct expenses paid for those events.[20]

Ms. Valentine claimed expense deductions for travel to Montgomery, Alabama, on January 26. Her calendar has an entry for travel to Maxwell Air Force Base in Montgomery, Alabama, on January 26, and her bank statements list charges paid in the area during that time. However, Ms. Valentine traveled to Maxwell Air Force Base for Air Force training, and the Air Force paid her airfare and a per diem allowance for meals and incidentals incurred on the trip. Ms. Valentine did not provide evidence to show she paid any business-related expenses independent of her Air Force training while traveling to Montgomery, Alabama, and thus does not sufficiently substantiate any of the associated meal allowances she claimed. She is not entitled to deduct expenses that the Air Force paid directly or for which she received reimbursement.[21]

### iii.    *Conferences*

Ms. Valentine claimed deductions for travel expenses she paid for four LegalShield "Leadership Summit" conferences held in Dallas, Texas, from March 10 through 14; San Jose, California, from April 6 through 11; Oklahoma City, Oklahoma, from July 14 through 17; and New Orleans, Louisiana, from September 9 through 11. Ms. Valentine's calendar has an entry for travel to each of these four destinations on the

---

[20] Specifically, these supposed events include: (1) a business luncheon in Greenbelt, Maryland, on March 16, (2) a BOM in Greenbelt, Maryland, on May 10, (3) a business opportunity reception in Bowie, Maryland, on June 29, (4) a BOM ("Sensational Sunday") in Newark, Delaware, on August 7, and (5) a BOM in Greenbelt, Maryland, on August 9.

[21] "A trade or business expense deduction is not allowable to an employee to the extent that the employee is entitled to reimbursement from his or her employer for an expenditure related to his or her status as an employee." *Lucas v. Commissioner*, 79 T.C. 1, 7 (1982) (citing *Heidt v. Commissioner*, 274 F.2d 25 (7th Cir. 1959), *aff'g* T.C. Memo. 1959-31).

[*24] dates above and we address substantiation of expenses at each destination in chronological order.

a.    *Dallas, Texas (March 10–14)*

Ms. Valentine did not offer sufficient evidence to corroborate her calendar's Dallas entry beginning March 10.  The bank statements she provided do not show transactions in March after the seventh day of the month and, hence, cannot substantiate expenses she may have paid while traveling to and around Dallas after that time.  She does not provide copies of receipts for hotel, meal, or conference expenses.  The bank statements she provided show airfare purchases on three purchase dates: February 19, August 14, and October 30.  Conceivably, the airline ticket purchased in February could be associated with her trip to Dallas in March, but the statement does not provide destination information, and Ms. Valentine did not offer additional evidence to support this hypothesis.[22]  Consequently, Ms. Valentine has failed to corroborate her calendar entry, and we hold that she has failed to substantiate the destination, travel dates, and amount of any travel expenses in Dallas for which she claims deductions.

b.    *San Jose, California (April 6–11)*

Ms. Valentine did offer sufficient evidence to corroborate her calendar's San Jose entry beginning April 6.  Her bank statements show meal charges and ATM withdrawals in San Jose, California, during the requisite period.  Ms. Valentine also provided ticket stubs showing the amount, location, and date of each event in San Jose, which substantiate both her attendance and the fees for conference events totaling $85.  She did not provide a record or other documentary evidence (such as a receipt) for lodging during her stay and, as discussed, Ms. Valentine's bank statements fail to match airfare purchases to travel destinations in any specificity.  However, we conclude that Ms. Valentine booked

---

[22] Ms. Valentine's bank statement reflects airfare purchases exclusively from Southwest Airlines, a company headquartered in Dallas, Texas. The letters "TX" appear at the end of each transaction line. The transactions appear on Ms. Valentine's bank statements in February, August, and October, but Ms. Valentine reported travel to Dallas in March only. Therefore, the "TX" in each transaction line likely refers to the Southwest Airlines company headquarters and not to a travel destination. Otherwise, the last letters in each transaction line would vary depending upon the destination (e.g., "CA," "OK," and "LA"). Under our analysis set out here, Ms. Valentine can deduct expenses for two of her three substantiated airline trips (since we allocate February to San Jose and August to New Orleans); and her October airline ticket was too late for any of the four conferences.

**[\*25]** airline travel in advance, and we will allocate the airline expenses closest in time to her travel to destinations for which she has corroborated her calendar entry. We therefore associate the airfare purchase of $343 in February with her San Jose trip and hold that she has substantiated this expense sufficiently.[23] She also claims 68 miles (34 miles on each day of travel, evidently to and from the airport), for which we approve a deduction of $37. *See* I.R.S. Notice 2016-1. Last, Ms. Valentine claims six days of meal allowance of $408, which we will adjust, using the aforementioned GSA guidelines, to $176.[24]

      c.     *Oklahoma City, Oklahoma (July 14–17)*

Ms. Valentine did not offer sufficient evidence to corroborate her calendar's Oklahoma City entry beginning July 14. Her bank statements show a transaction entitled "Legalshield \*Event" in February with the letters "OK" at the end of the transaction description. It is not impossible that this transaction corresponds with the Oklahoma calendar entry. But Ms. Valentine's bank statements do not reflect any transactions in Oklahoma during the time of the conference. Ms. Valentine likewise did not offer evidence regarding meal or lodging expenses for the Oklahoma conference. We therefore hold that Ms. Valentine has not met her burden of substantiation and may not deduct expenses for travel to Oklahoma City.

      d.     *New Orleans, Louisiana (September 9–11)*

Ms. Valentine did offer sufficient evidence to corroborate her calendar's New Orleans entry beginning September 9. Her bank statements show transactions for meal expenses in New Orleans during the requisite period. She also provides two ticket stubs (in the amounts

---

[23] Ms. Valentine's bank statement lists four separate transactions with Southwest Airlines on this purchase date, two transactions of $12.50 each and two transactions of $158.98 each (totaling $342.96, which we round to $343). We interpret the former two charges as either baggage fees or similar charges and the latter two charges as her departing and returning flights. The remaining Southwest Airlines transactions on her bank statement follow an identical format (but vary in price), and we interpret those transactions in the same manner.

[24] *See* FY 2016 Per Diem Rates for Sunnyvale / Palo Alto / San Jose, California, U.S. Gen. Servs. Admin., https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-results/?action=perdiems_report&fiscal_year=2016&city=San%20Jose &state=CA&zip= (last visited Apr. 8, 2022).

**[*26]** of $159 and $15) substantiating the LegalShield event dates and location. Ms. Valentine does not provide evidence of any expenses paid for lodging. We associate the airfare purchase of $434 in August with this trip.[25] Ms. Valentine claims three days of meal allowances totaling $171, which we adjust to $80, following GSA guidelines.[26] We will allow a mileage expense deduction of $37 for the 68 miles claimed (34 miles on each of her travel days, evidently to and from the airport). *See* I.R.S. Notice 2016-1.

6. *Miscellaneous expenses*

Ms. Valentine's bank statements show monthly fees paid for access to LegalShield's website service. The statements list the date and amount of each transaction, and Ms. Valentine credibly testified that she used the website to enroll new customers in LegalShield products. Therefore, we hold that she has sufficiently substantiated her website expenses and may claim a corresponding deduction of $219.

Ms. Valentine failed to substantiate the remaining business expenses reported on Schedule C, and we therefore deny the deductions she claimed for these expenses. Although she provided bank statements showing payments for various highway tolls, we cannot reasonably relate the dates of these transactions to any date of travel for which she claimed a deduction. Ms. Valentine offered no documentary evidence or testimony to substantiate the expenses she reported for advertising, commissions and fees, legal and professional services, office expenses, postage, business phone, or "Info tracks", and we must deny deductions for these in full. Ms. Valentine listed "Incidentals" individually in the reported "Other expenses" on Schedule C, but we include these "Incidentals" in the standard "meal and incidental" allowance deductions that we approved above. To the extent we did not approve a meal and incidental allowance for travel specifically, we deny Ms. Valentine's expense deductions for incidentals.

_____

[25] Ms. Valentine did not deduct expenses for any out-of-state conference-related travel after the month of August and so the airfare charges paid in the month of October must relate to either personal travel or business-related travel after the year at issue.

[26] *See* FY 2016 Per Diem Rates for New Orleans, Louisiana, U.S. Gen. Servs. Admin., https://www.gsa.gov/travel/plan-book/per-diem-rates/per-diem-rates-results/?action=perdiems_report&fiscal_year=2016&city=New%20Orleans&state=LA&zip= (last visited Apr. 8, 2022).

[*27]      7.      *Summary*

The disputed expenses that Ms. Valentine substantiated, compared to the deductions she claimed on Schedule C, are as follows:

|  | *Expenses reported on Schedule C* | *Expenses substantiated* |
|---|---|---|
| Advertising | $30 | -0- |
| Car and truck expenses | 6,181 | $280 |
| Commissions and fees | 725 | -0- |
| Legal and professional services | 270 | -0- |
| Office expense | 344 | -0- |
| Travel (i.e., airfare) | 1,122 | 777 |
| Deductible meals and entertainment | 918 | 277 |
| Website | 239 | 219 |
| Postage | 111 | -0- |
| Business phone | 837 | -0- |
| Info tracks | 150 | -0- |
| Convention fees | 460 | 259 |
| Tolls | 191 | -0- |
| Incidentals | 135 | -0- |
| Total | $11,713 | $1,812 |

**[\*28]**  C.  *Additions to tax under section 6651(a)(1) and (2)*

     1.     *Section 6651(a)(1) addition to tax for failure to file*

In the SNOD the IRS determined against Ms. Valentine additions to tax under section 6651(a)(1) for failure to timely file and under subsection (a)(2) for failure to timely pay. Ms. Valentine filed her 2016 income tax return on March 25, 2019, despite an October 2017 due date. These facts are not in dispute and are sufficient to establish that the Commissioner has met his burden of production to establish Ms. Valentine's liability under section 6651(a)(1). Ms. Valentine's only defense to these additions to tax would be a showing that her failure to file a return was due to reasonable cause and not willful neglect, for which she bears the burden of proof. *See Higbee*, 116 T.C. at 447. In that regard Ms. Valentine argued that she was unable to file a return because she could not find an accountant familiar with section 104(a)(4) (as it applied to her disability payments and retirement distributions).

We find this argument unpersuasive. Ms. Valentine does not present any evidence to support that she searched for an accountant diligently, nor any communication (such as emails, notes regarding conversations, lists of accountants contacted) to show that any accountant she did contact was unfamiliar with section 104(a)(4), or that such a search could reasonably take a year and a half to complete. Since this addition to tax accrues at 5% per month for a maximum of 25%, a delay of as little as five months yields the maximum addition. So even if Ms. Valentine could show "reasonable cause" for not filing until October 2018 (when the return was a year overdue), a return filed five months later in March 2019 would still accrue the maximum addition to tax.

Additionally, given the errors on Ms. Valentine's return in the reporting of her taxable retirement distributions, it does not appear that the accountant Ms. Valentine found had particular competence in this specific area—making her prolonged search both unfruitful and unreasonable. We hold that Ms. Valentine is liable for the addition to tax under section 6651(a)(1) for failure to timely file.

     2.     *Section 6651(a)(2) addition to tax for failure to pay*

Section 6651(a)(2) imposes an addition to tax for failure to timely pay the amount of tax shown on a return. (This addition is equal to one-half percent of the tax shown but unpaid per month, again up to 25%.) The addition to tax under section 6651(a)(2) applies only when an

**[\*29]** amount of tax is shown on a return—in this case, on the SFR that the Commissioner prepared for the year for which the addition was determined. *See Wheeler*, 127 T.C. at 210. The SFR prepared by the IRS contains sufficient information, purports to be a return, and is subscribed as required by section 6020(b). Accordingly, the Commissioner has met his burden to show that tax was shown on a return and was unpaid.[27]

As with the section 6651(a)(1) failure-to-file addition to tax, section 6651(a)(2) provides that the taxpayer is liable for the failure-to-pay addition to tax "unless it is shown that such failure is due to reasonable cause and not due to willful neglect". Ms. Valentine did not prove or even allege that her failure to pay was due to reasonable cause and not willful neglect. Therefore, we hold that she is liable for the addition to tax under section 6651(a)(2).

*Conclusion*

The determinations in the SNOD are sustained in large part, to the extent set out above. To give effect to the foregoing,

*Decision will be entered under Rule 155.*

---

[27] Ms. Valentine's late-filed return (filed after preparation of the SFR) has no effect on our analysis under section 6651(a)(2). Under section 6651(g)(2), the SFR prepared by the Commissioner under section 6020(b) is treated as Ms. Valentine's return for purposes of determining the addition to tax under section 6651(a)(2).